Franklin, Appellant, *v.* Julian, Appellee.
Truax, Appellee, *v.* Hall, Appellant. (Two cases.)

[Cite as Franklin v. Julian (1972), 30 Ohio St. 2d 228.]

(Nos. 71-633, 71-668 and 71-669—Decided June 7, 1972.)

*Messrs. Dagger & Johnston* and *Mr. William C. Dagger,* for appellant in case No. 71-633.

*Messrs. Jackson & Kellner,* for appellee in case No. 71-633.

*Messrs. Lancione, Lancione & Lancione* and *Mr. Richard L. Lancione,* for appellee in cases Nos. 71-668 and 71-669.

*Messrs. Malik, Malik & Knapp* and *Mr. Edward G. Sustersic,* for appellant in cases Nos. 71-668 and 71-669.

SCHNEIDER, J. The history of the human race is, in part, the effect of prejudice upon motives and purposes. Nowhere is this more sharply illustrated than in the treatment of the illegitimate child. Over the centuries he has been the innocent object of prejudice transferred from the guilt of his conception. As a consequence of the sin of his parents, he was legally the child of no one. As his and his mother's needs for care and maintenance became an increasing charge upon society, statutes were adopted to shift that burden to the natural father.

So it was that one of the first acts of the Third General Assembly in 1805 was entitled "An Act, for the Maintence and Support of Illegitimate Children." (3 Ohio Laws 167.) It was plainly designed for the protection of the

single woman as well as her child, who could be legitimated upon the marriage of the parents, at least under the civil law, the common law of Scotland, and by statute in this state. See *Ives* v. *McNicoll* (1898), 59 Ohio St. 402, 413.

But the offspring of a mother's adulterous connection, the adulterine bastard, carried an even greater stigma. He could not be legitimated under any law of Western Europe and his mother's sin was so gross it could not even be admitted under the common law of England unless her husband was proved to have been beyond the seas during all the period in which it was possible for her to have become pregnant or unless it could be shown beyond question that her husband had no powers of procreation. *Powell* v. *State, ex rel. Fowler* (1911), 84 Ohio St. 165, 168. And this was so even though the mother's marriage was subsequently dissolved.

These considerations may well have dictated the result in *Haworth* v. *Gill* (1876), 30 Ohio St. 627, the first case decided by this court involving a construction of the scope of the bastardy statutes in the context of the situation presented by the first of these cases. The Act involved in *Haworth* (70 Ohio Laws 111) was a substantial successor to the Act of 1805. The facts were identical to case No. 71-633.

The statute was not dissimilar in effect from the present form. It commenced: "When any unmarried woman, who has been delivered of or is pregnant with a bastard child, shall make complaint thereof in writing. . . ." R. C. 3111.01 commences: "When an unmarried woman, who has been delivered of, or is pregnant with, a bastard child, makes a complaint in writing. . . ."

*Haworth* denied relief, saying that the statutes were "not intended to invite or authorize an inquiry into the legitimacy of children begotten and born in lawful wedlock, whenever a heartless mother might desire to bastardize them at the expense of her own infamy." (30 Ohio St. 628.)

Quoting Blackstone and Kent, the court defined a

bastard as one that is begotten *and* born out of lawful matrimony, and thus conception and delivery, as well as the filing of the complaint, were "predicated of an *unmarried* woman." (*Ibid.*)

When *Powell, supra,* was considered in 1911, *Ives, supra,* had already recognized an adulterine bastard as one "begotten of an adulterous connection between a man and woman who at that time could not make a valid contract of marriage." (59 Ohio St. 413.) Thus, by recognizing the presumption of legitimacy of a child conceived during wedlock to be rebuttable, *Powell* inferentially confirmed the *Ives* recognition of an adulterine bastard and rejected the conclusive presumption foundation of *Haworth.*

By 1944, when *State, ex rel. Walker,* v. *Clark* (1944), 144 Ohio St. 305, came to this court, blood-grouping tests had been developed which can positively disprove paternity. Thus, that decision modified the *Powell* rule of proof but otherwise reaffirmed the rule that an adulterine bastard was included within the protection of a bastardy action.

Eight short years later, *State, ex rel. Hoerres,* v. *Wilkoff* (1952), 157 Ohio St. 286, by a remarkable inversion of philosophy, denied a mother the opportunity to rebut the presumption of legitimacy of her child simply because it was born as well as conceived during her marriage which was dissolved prior to the commencement of the action, as were the marriages in *Haworth* and *Powell.*[1]

*Hoerres* emphasized the "statutory" and "penal" nature of the proceeding (ignoring *Carter* v. *Krise* [1859], 9 Ohio St. 402, holding the essential character of the proceedings to be civil), repeated a slur against an adulteress

---

[1]Compare *Miller* v. *Anderson* (1885), 43 Ohio St. 473, in which the action was denied a mother who, after conceiving by one man, married another who had knowledge of her condition. But see, also, *Roth* v. *Jacobs* (1871), 21 Ohio St. 646, holding that a mother's subsequent marriage with another after filing the complaint did not necessarily work a discontinuance of the action, for the reason that it cannot be conclusively presumed that the man who marries a pregnant woman is the father of the child.

similar to that quoted hereinabove from *Haworth* as one who would "place in issue the legitimacy of offspring according to her whim or fancy" (157 Ohio St. 287), beclouded the meaning of the statutory word, "unmarried," by applying it to the "time of the delivery of the child involved" (*ibid.*), and reaffirmed *Haworth*.

In our present opinion, *Hoerres* and *Haworth* were actuated by those ancient passions and prejudices to which reference has heretofore been made, disregarded the correct definition of an adulterine bastard as stated in *Ives* by placing an arbitrary and unrealistic line of demarcation between "begotten" and "born," are regressive in both thought and principle and, finally, should be and are hereby overruled. To the same effect, see *State, ex rel. Sprungle,* v. *Bard* (1950), 59 Ohio Law Abs. 129; and *State* v. *Hunt* (1962), 13 Utah 2d 32, 368 P. 2d 261. See, also, Illegitimacy Proceedings in Ohio, 37 Cincinnati L. Rev. 594.

Therefore, the judgment of the Court of Appeals in case No. 71-633 is reversed and the cause is remanded for further proceedings consistent herewith.

Having established that "unmarried" relates not to the time of conception or birth, as we turn to the second situation presented by cases Nos. 71-668 and 71-669, we are confronted with that word as relating to the time of commencement of a bastardy action, thus barring a married woman from its benefits of support for herself both before and after delivery and the expenses thereof. R. C. 3111.17.[2] Having voluntarily abandoned the single state and chosen

---

[2] R. C. 3111.17 provides, in part:

"If the child is alive, the court shall adjudge that he [the accused] pay to the complainant such sum as the court finds necessary for her support and maintenance, and the necessary expenses caused by pregnancy and childbirth, together with costs of prosecution. . . . In the event the child is not born alive, or is not living at the time of the plea or finding of guilty, the court shall order the accused to pay the complainant such sum as the court finds necessary for her support and maintenance, and the necessary expense caused by pregnancy, including a reasonable amount for maintenance of the child until such child's death, and for the funeral expenses of such child."

to marry one upon whom she may depend for maintenance other than the putative father of her children, her claim for her own support does not merit our further attention.

But is this so of the unfortunate children who may look to no other man for support except their natural father? May the action proceed for their benefit and for necessaries furnished by their mother, if any, in the past? We think that it may.

As early as *Carter* v. *Krise, supra* (9 Ohio St. 402), this court declared that "the essential nature, aim and object" of a bastardy proceeding was "a remedy to enforce the discharge of a civil and moral duty . . . of every man who becomes the father of a child to contribute to its support, and to save the public from the burden of its maintenance." (9 Ohio St. 406.)

Nearly 30 years later, in *Pretzinger* v *Pretzinger* (1887), 45 Ohio St. 452, that "duty of the father to provide reasonably for the maintenance of his minor children, if he be of ability," was said to be an "obligation to support them, not only by the laws of nature, but by the laws of the land." Furthermore, "[i]t is not the policy of the law to deprive children of their rights on account of the dissensions of their parents, to which they are not parties; or to enable the father to convert his own misconduct into a shield against parental liability." (45 Ohio St. 458.)

The latter case, of course, was concerned with a legitimate child for whose support the divorce decree of his parents made no provision, and the rule announced was that the mother, to recover against the father for necessaries furnished the child, was not relegated to return to the court which granted the decree for an award of support as provided by statute, but might proceed to recover in a civil action against the father in any jurisdiction where he may be found. However, no statutory right or duty was invoked to support the decision.

In 1948, *McDaniel* v. *Rucker* (1948), 150 Ohio St. 261, reaffirmed the rule and added a corollary: that such

recovery may include an allowance for the temporary support and maintenance of the child.[3]

The significant attributes of those cases for our present purposes are that on the one hand they stated a public policy not in conflict with any statute but in furtherance of the objects of the statutory law. On the other hand, *Carter* construed the statutory bastardy proceedings not as creating a duty but as providing a remedy to enforce a common-law duty and *Pretzinger* and *McDaniel* declared a remedy supplementary to the statutes to enforce a common-law duty based upon the same considerations of public and private advantage.

Thus, we need not here inquire whether the three additional weapons in the statutory arsenal with which to force the errant father to account for his duty—the support actions of a criminal nature ordained by R. C. 2151.42, 2903.08 and 3113.01 (the first antecedent of which was enacted as late as 1890 in 87 Ohio Laws 216)[4]—give rise to a statutorily imposed duty of support enforceable in a civil action on behalf of the illegitimate child or on behalf of his mother for necessaries furnished to him.[5]

That those statutes are now a part of our Code and apply equally to illegitimate and legitimate children fortifies our decision today. As well does the observation that as of today the illegitimate enjoys a statutory recognition and a status as nearly equal to that of his legitimate counterpart as his circumstances will permit.[6] Fur-

---

[3]See, however, *Fulton* v. *Fulton* (1895), 52 Ohio St. 229, which abjured the *Pretzinger* rule where the mother was the aggressor.

[4]See *Bowen* v. *State* (1897), 56 Ohio St. 235, 239, in which it was said that the design of the statute, which is now R. C. 3113.01, "was to enforce, as far as practical, the fulfillment of the father's duty to the public. . . ."

[5]However, *Baston* v. *Sears* (1968), 15 Ohio St. 2d 166, is overruled and the question decided in that case is left open for future resolution.

[6]The sole additional statutory benefit to legitimate offspring is the jurisdiction granted to a divorce or juvenile court to determine custody and support upon the dissolution of the marriage of which they are the product. R. C. 3105.21, 3109.04, 3109.05 and 3109.06.

thermore, the General Assembly has acquiesced in all the decisions of this court referred to.

For it seems eminently sound to us that the same principle which furnishes a civil remedy on behalf of legitimate children supplementary to that provided them by statute in the case of the dissolution of the marriage of which they are the offspring suffices to furnish a similar remedy on behalf of illegitimate children to enforce the identical duty—a duty arising from fatherhood. The bastard need not be left with the criminal remedies. See Annotation, 13 A. L. R. 2d 1142.

To hold otherwise would render us guilty of laying an unequal and oppressive hand on those whose only offense, if any, and whose only distinction is the irregularity of their parentage. "The equal protection clause would indeed be a formula of empty words if such conspicuously artificial lines could be drawn." *Skinner* v. *Oklahoma, ex rel. Williamson* (1942), 316 U. S. 535, 542. See, also, *Levy* v. *Louisiana* (1968), 391 U. S. 68; *Glona* v. *American Guarantee & Liability Ins. Co.* (1968), 391 U. S. 73; *Weber* v. *Aetna Casualty & Surety Co.* (1972), U. S. , 40 Law Week 4460; and *Stanley* v. *Illinois* (1972), U. S. , 92 S. Ct. 1208. But compare *Labine* v. *Vincent* (1971), 401 U. S. 532, 28 L. Ed. 2d 288.

Nor let it be said that the bastardy statutes provide the exclusive method for determining paternity. The same principle which permits that issue to be decided in the first instance in a criminal proceeding (*State* v. *Carter* [1963], 175 Ohio St. 98) suffices to permit the same issue to be decided in a civil action for support and necessaries furnished. See, also, *State* v. *Snyder* (1952), 157 Ohio St. 15 (divorce decree, finding paternity, not admissible in criminal action to prove paternity—blood-grouping test admissible in criminal action to disprove paternity).

Our final inquiry is whether the actions commenced by the mother in these two cases (Nos. 71-668 and 71-669) may be saved as actions for necessaries and support of the children. The complaints merely set forth the facts of the illegitimate births. The defendant has been served with

process and entered into a recognizance. Under the principles of permitting liberal amendment of pleadings established by our Rules of Civil Procedure, the causes will be remanded to the Court of Common Pleas for proceedings upon such proper amendments of pleadings as to necessaries furnished in the past, and motions as to support for the future, as the complainant shall file. The defendant will not be prejudiced. He will be entitled to a jury trial on all factual issues, including that of paternity.

*In case No. 71-633, judgment reversed.*
*In cases Nos. 71-668 and 71-669, judgments modified.*

O'NEILL, C. J., HERBERT, CORRIGAN, STERN, LEACH and BROWN, JJ., concur.